MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2016 ME 38
Docket:        Fra-14-469
Argued:        November 3, 2015
Decided:       March 8, 2016

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and
               HUMPHREY, JJ.

## TOWN OF CARTHAGE

v.

## FRIENDS OF MAINE'S MOUNTAINS

SAUFLEY, C.J.

[¶1]  This appeal arises from a complaint filed by the Town of Carthage in 2010 seeking to quiet title to two 160-acre parcels of undeveloped land.  The Town based its claim of ownership of the land on its uninterrupted possession of the land for over a hundred years.  Friends of Maine's Mountains (FOMM) filed an answer and counterclaim, claiming to have recently acquired an interest in the parcels through a descendent of the parcels' last known owner.

[¶2]  After hearing arguments, the Superior Court (Franklin County, *Murphy, J.*) granted a summary judgment for the Town and entered a declaratory judgment in favor of the Town.  FOMM appeals,[1] arguing that the Superior Court

---

[1]  The Town of Carthage cross-appeals from the court's denial of summary judgment on other grounds, including laches, Friends of Maine's Mountains's standing, and adverse possession.  Because we affirm the court's grant of summary judgment pursuant to the municipal delinquent tax title statute, we do not reach the Town's alternative arguments.

2

erred in determining that the undisputed facts demonstrated that the Town obtained title to the two parcels of property through a tax sale that took place over 110 years ago in 1905.[2] We affirm the judgment.

## I. BACKGROUND

[¶3] Viewed "in the light most favorable to the party against whom the summary judgment has been granted," the following facts are drawn from the statements of material facts and are undisputed unless expressly stated otherwise. *Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484 (quotation marks omitted).

[¶4] The Town of Carthage is a municipality that was incorporated in 1826, located in Franklin County. Within the Town are two 160-acre parcels of land, identified as Lot 8 in Range 4 and Lot 8 in Range 5. The ownership of these parcels of land forms the basis of the dispute before us.

[¶5] Available documentation of ownership of the parcels begins with the Town's 1826 Tax Valuation and Commitment Book listing Benjamin Weld as the 1824 "non-resident owner" of Lots 8 in Ranges 4 and 5. In a deed recorded in the Cumberland County Registry of Deeds and dated December 19, 1843, land owned by Benjamin Weld, deceased, was transferred from Caroline Weld, as

---

[2] We are not persuaded by FOMM's arguments that the court erred or abused its discretion in entering a default and default judgment against FOMM's predecessors in title or in denying its motion to reconsider the summary judgment.

administratrix, to Joseph McKeen, Esq. On December 21, 1843, McKeen transferred the property back to Caroline Weld. No records have been found in the Franklin County, Oxford County, or Cumberland County Registries of Deeds showing a transfer of the lots after the transfer from McKeen to Caroline Weld in 1843.

[¶6] Approximately sixty years after that transfer, in 1902, 1903, and 1904, the tax commitment books for the Town listed the owners of Lots 8 in Ranges 4 and 5 as "owners unknown." In 1902, the Town valued Lot 8 in Range 4 at $75 and Lot 8 in Range 5 at $50, and listed each lot as containing 160 acres. In 1903 and 1904, the Town valued each lot at $75.

[¶7] In 1903, the Town published a notice that the two lots would be sold for unpaid taxes on the first Monday in December at 9:00 a.m. at the old schoolhouse. The 1903 notice was published in the October 21, October 28, and November 4, 1903, editions of the *Farmington Chronicle*. The 1903 notice stated that the owners of the two lots were "unknown." It also specified that the lots were Lot 8 in Range 4 and Lot 8 in Range 5, that the lots were valued at $75 and $50, respectively, and that each lot contained 160 acres.

[¶8] Also in 1903, the Carthage tax collector filed a Collector's Certificate with the town regarding the purchase of Lots 8 in Ranges 4 and 5 "[f]or the

4

inhabitants of Carthage" for $7.62. No deeds appear to have been recorded at the Franklin County Registry of Deeds.

[¶9] In 1905, the Town again placed a notice in the *Farmington Chronicle* for three consecutive weeks—October 18, October 25, and November 1, 1905— that Lots 8 in Ranges 4 and 5 would be sold for unpaid taxes. The parties agree that the tax collector's "Collectors Return to Town Clerk of Tax Sales" lists the sale of the two parcels to the Town of Carthage and states an amount of taxes, interest, and charges of $10.74 ($5.37 per lot). FOMM, however, argues that there is no indication that the Town actually paid anything for either lot, whereas the Town asserts that the document itself is evidence that the Town paid $10.74 for both lots. No deed appears to have been recorded by the Town in the registry of deeds.

[¶10] From 1905 to 1938, the Town consistently listed the lots in the "Resources" section of the Annual Town Reports, meaning that it was property belonging to the Town and not included as taxable property in the valuation to the State. Eventually, the Town stopped listing "Resources" in the Annual Town Reports but continued a handwritten Tax Valuation and Commitment Book until 1993, when records were digitized. There were a few years in which the Town did not identify Lot 8 in Range 4 as Town property in its Tax Valuation and

Commitment Book. The Town map of 1907 shows Lots 8 in Ranges 4 and 5 as Town lots.

[¶11] From 1980 to the present day, the lots have been included in the tax evaluation reports sent to the State as tax-exempt Town-owned properties. In 1989, the lots were again identified as belonging to the Town on a map. The Town has also included the lots in its Inventory and Valuation of the Polls and Estates for the Town of Carthage. For over 100 years, the Town has listed and claimed the lots as Town-owned tax-exempt property in its valuation reports to the State.

[¶12] In March 2010, the Town filed a complaint to clear title to the two 160-acre parcels of land and for a declaratory judgment against "[a]ll those persons unknown claiming [title to the land] by, through and under Caroline Weld, last known of Brunswick, County of Cumberland, State of Maine." The Town asserted four counts in its amended complaint, including a claim for equitable relief pursuant to the municipal delinquent tax title statute, 36 M.R.S. § 946 (2015).

[¶13] FOMM filed an answer and counterclaim for quiet title and a declaratory judgment, asserting that it obtained an interest in the land by a quitclaim release deed executed by William A. Potter, an alleged descendant of Caroline Weld—the last known owner of the property before the tax sale.

[¶14] After the court denied the Town's motion to dismiss FOMM's counterclaim for lack of standing, determining that the issue of standing was

inextricably intertwined with the merits, the Town moved for a summary judgment. On May 5, 2014, the court granted a summary judgment in favor of the Town pursuant to the municipal delinquent tax title statute. The court entered a default and default judgment against Warwick Potter III, William A. Potter, and all other possible claimants, excluding FOMM, and a declaratory judgment in favor of the Town, declaring that it owned the two 160-acre lots in fee simple absolute. This appeal followed.

## II. DISCUSSION

### A.    Standard of Review

[¶15]  "We review the grant of a motion for summary judgment de novo, and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact." *Budge*, 2012 ME 122, ¶ 12, 55 A.3d 484 (quotation marks omitted). "A fact is material if it has the potential to affect the outcome of the suit, and a genuine issue of material fact exists when a fact-finder must choose between competing versions of the truth, even if one party's version appears more credible or persuasive." *Angell v. Hallee*, 2014 ME 72, ¶ 17, 92 A.3d 1154 (quotation marks omitted). When the material facts are not in dispute, we review de novo the trial court's interpretation and application of the relevant statutes and legal

concepts. *See Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 7, 17 A.3d 667.[3]

B.     Relevant Statutory Provisions

[¶16]  Title 36 M.R.S. § 946 provides,

A municipality which has become the purchaser at a sale of real estate for nonpayment of taxes or which as to any real estate has pursued the alternative method for the enforcement of liens for taxes provided in sections 942 and 943, whether in possession of such real estate or not, after the period of redemption from such sale or lien has expired, may maintain an action for equitable relief against any and all persons who claim or may claim some right, title or interest in the premises adverse to the estate of such municipality.

FOMM asserts that irregularities in the Town's actions in 1905 precluded the transfer of title to the Town. It is therefore necessary to review the relevant statutory authority in effect at the time of the sale.

[¶17]  The relevant provisions in effect in 1905 provided the following: "There shall be a lien to secure the payment of all taxes legally assessed on real estate." R.S. ch. 9, § 3 (1904). Taxes "shall be assessed . . . to the owner or person in possession thereof," or, in the case of a deceased owner, "may be assessed" to the owner's heirs or devisees. R.S. ch. 9, §§ 8, 21 (1904). In addition, if property changed ownership and no notice of the change in ownership was given to the

---

[3]  Although FOMM originally challenged the court's judgment on the basis of its claim that it was unprepared for argument on the validity of the Town's title, it ultimately withdrew that challenge in its brief.

8

municipality, property assessments made to the person to whom the property was last assessed were valid.  R.S. ch. 9, § 24 (1904).  The statute did not specify the procedures to be followed when a municipality was unable to discern the owner of real estate located in the municipality.

[¶18]  Where taxes remained unpaid, the collector was directed to "sell at public auction so much of such real estate or interest as is necessary for the payment of said tax, interest, and all the charges."  R.S. ch. 10, § 73 (1904).  After property had been sold, a redemption procedure was available to protect landowners.  *See* R.S. ch. 10, § 77 (1904) (stating when real estate was sold for taxes the deed would not be delivered to the grantee until "one year from the day of sale in the case of lands of non-resident owners, if the owner does not within such time redeem his estate from the sale"); R.S. ch. 10, § 79 (1904) (stating "[a]fter the deed of land of a non-resident owner is so delivered, the owner has six months within which to redeem his estate, by paying to the purchaser the sum by him so paid").

[¶19]  The statute directed the collector, within thirty days after a sale, to "make a return, with a particular statement of his doings in making such sale, to the clerk of his town; who shall record it in the town records."  R.S. ch. 10, § 80 (1904).  It also provided,

> In the trial of any action at law or in equity, involving the validity of any sale of real estate for non-payment of taxes, it shall be sufficient for the party claiming under it, in the first instance, to produce in evidence the collector's or treasurer's deed, duly executed and recorded, which shall be prima facie evidence of his title, and if the other party claims and offers evidence to show that such sale was invalid and ineffectual to convey the title, the party claiming under it shall have judgment in his favor so far as relates to said tax title, if he then produces the assessment, signed by the assessors, and their warrant to the collector, and proves that such collector or treasurer complied with the requirements of law in selling such real estate; *and in all such actions involving the validity of sales made after April twenty-six, eighteen hundred and ninety-five, the collector's return to the town clerk, the town clerk's record, or if lost or destroyed, said clerk's attested copy of such record, as provided in section eighty, shall be prima facie evidence of all facts therein set forth.*

R.S. ch. 10, § 87 (1904) (emphasis added).

C.    Analysis

[¶20]  FOMM contends that the Superior Court erred in determining that the undisputed facts demonstrate that the Town obtained title through the tax sale in 1905.  FOMM makes three primary arguments to support this contention: (1) the Superior Court misinterpreted section 87 in determining that the tax collector's return constitutes prima facie evidence that the Town purchased the parcels at the 1905 tax sale without the production of additional evidence, including a deed; (2) the tax collector exceeded his authority when he sold all 320 acres of the property, valued at $150, in fee simple absolute for $10.74; and (3) the Town's 1904 assessment of the property to "owners unknown" violated the statute.

[¶21]   We first address FOMM's contention that the statute requires the Town to produce a deed, an assessment signed by the assessors, and the warrant to the tax collector, and to prove that the collector complied with all requirements in executing the sale, before the collector's return constitutes prima facie evidence of the sale and its validity.

[¶22]   The statute provided two methods of demonstrating prima facie evidence of title.  *See* R.S. ch. 10, § 87.  First, the production of a deed was prima facie evidence of title; if the prima facie evidence was rebutted, title could be proved by production of the assessment, the warrant, and proof of the collector's compliance.  *Id.*  Second, for sales effected after April 1895, the collector's return was prima facie evidence of "all facts therein set forth."  *Id.*  Therefore, although the statute's first clause referred to the production of the documents that FOMM argues are required to prove title, the relevant portion treating the collector's report as prima facie evidence was a separate clause that was not dependent on the production of any documents or additional proof.  *See id.*  Thus, the collector's return offered by the Town constituted prima facie evidence that the Town of Carthage purchased both parcels at the 1905 tax sale for the amount due of $10.74.

[¶23]   Once the Town produced prima facie evidence that it purchased the parcels at the 1905 tax sale, the burden was on FOMM to rebut that showing.  *See Gray v. Hutchins*, 150 Me. 96, 104, 104 A.2d 423 (1954).  Because FOMM did not

assert or prove any facts contrary to those asserted in the collector's return, the prima facie evidence becomes undisputed conclusive evidence of the sale. *See Town of Blue Hill v. Leighton*, 2011 ME 103, ¶ 12 n.5, 30 A.3d 848.

[¶24]  We next address FOMM's argument that the tax collector exceeded his authority.  Here, the collector's return also constituted prima facie evidence that the sale complied with the statutory procedures for the sale and that the tax collector did not exceed his authority in selling both parcels for a total of $10.74. *See* R.S. ch. 10, §§ 73, 87.  Aside from arguing about the value of the property compared to its sale price, FOMM has presented no evidence contrary to the collector's return that would rebut the showing that the collector did not exceed his authority.  Therefore, the prima facie evidence again becomes undisputed conclusive evidence that the collector did not exceed his authority. *See Town of Blue Hill*, 2011 ME 103, ¶ 12 n.5, 30 A.3d 848.

[¶25]  As to FOMM's last argument concerning the validity of the assessment, the 1904 assessment of the property by the Town to "owner unknown" was not a positive violation of law and did not invalidate the 1905 sale.  Although the statute provided for several ways to assess property, it provided no guidance when the Town was unable to discern the property owner or possessor, and no action had been taken concerning the particular parcels in over sixty-one years.

[¶26] Ultimately, to the extent that any infirmity did exist regarding the 1905 tax sale, any individuals claiming title to the land forfeited any challenge to the sale by their failure to act. *See* 36 M.R.S.A. § 946-A (Supp. 1993) ("A person may not commence an action against the validity of a governmental taking of real estate for nonpayment of property taxes upon the expiration of a 15-year period immediately following the expiration of the period of redemption."), *repealed and replaced by* P.L. 2014, ch. 521, §§ D-1, D-2 (codified at 36 M.R.S. § 946-B(3) (2015) ("For a tax lien recorded on or before October 13, 1993, a person must commence an action against its validity no later than 15 years after the expiration of the period of redemption or no later than July 1, 1997, whichever occurs later.")).

The entry is:

Judgment affirmed.

---

**On the briefs and at oral argument:**

Sarah A. McDaniel, Esq., Douglas McDaniel Campo & Schools LLC, PA, Westbrook, for appellant Friends of Maine's Mountains

Jennifer F. Kreckel, Esq., Kreckel Law, P.A., Rumford, for appellee Tow of Carthage